## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **BRYAN KIMUTIS** <br> 6400 Stirrup Road <br> Cincinnati, Ohio 45244 <br> <br>         **PLAINTIFF,** <br> <br> vs. <br> <br> **CITY OF CINCINNATI** <br> Interim Police Chief, Lt. Colonel <br> Teresa A. Theetge <br> 801 Plum Street <br> Cincinnati, Ohio 45202 <br> <br> and <br> <br> **MICHAEL ROETTING** <br> c/o City of Cincinnati Police Department <br> 310 Ezzard Charles Drive <br> Cincinnati, Ohio 45202 <br> <br> and <br> <br> **MOLLY SHUST** <br> c/o City of Cincinnati Police Department <br> 310 Ezzard Charles Drive <br> Cincinnati, Ohio 45202 <br> <br> and <br> <br> **KURTIS LATHAM** <br> c/o City of Cincinnati Police Department <br> 310 Ezzard Charles Drive <br> Cincinnati, Ohio 45202 <br> <br> *INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES AS EMPLOYEES OF THE CITY OF CINCINNATI, OHIO* <br> <br>         **DEFENDANTS.** | Case No.:   1:22-cv-289 <br> <br> Judge _____ <br> <br> <br> **COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF WITH JURY DEMAND** |

Comes now the Plaintiff, Bryan Kimutis, and for his Complaint states as follows:

## I.     NATURE OF THE ACTION

This is an action arising under 42 U.S.C. § 1983, the Constitution of the United States, and other state and federal law alleging that the City of Cincinnati ("City"), by and through its Police Officers and Administrators, and Cincinnati police officers Michael Roetting, Molly Shust, and Kurtis Latham, acting under color of state law and in the course of their official duties, violated Plaintiff Bryan Kimutis' rights under the Fourth and Fourteenth Amendments to be free from excessive force and unreasonable seizure of his person, and to due process of law. More specifically, Kimutis alleges that Roetting, Shust, and/or Latham, in part through use of excessive force, improperly executed a seizure of Kimutis' person and that the City and its police department failed to effectively train, supervise, monitor and discipline its police officers to prevent the use of excessive force and unlawful seizures by its officers. Kimutis further alleges that the City of Cincinnati through its police department through official policies, procedures, directives from responsible officials, customs and usage did carry out a massive action of brute force and oppression which violated Kimutis' rights under the First Amendment to freedom of expression, assembly, petition of the government, and due process of law, and the result of these actions was grievous injury to Kimutis' person.

## II.    JURISDICTION AND VENUE

1.     Kimutis seeks monetary damages against the Defendants on the grounds that the use of force and seizure of his person violated Kimutis' rights under the United States Constitution. Accordingly, Kimutis invokes this Court's federal question jurisdiction conferred

by 28 U.S.C. § 1331. Additionally, because Kimutis seeks this relief pursuant to 42 U.S.C. § 1983, this Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(4).

2. Venue is proper in the Southern District of Ohio, Western Division under 28 U.S.C. § 1391 since the incidents giving rise to the causes of action alleged herein occurred within this District and Division.

### III. PARTIES

3. Kimutis is a natural person who resides at 6400 Stirrup Road, Cincinnati, Ohio 45244.

4. Defendant City of Cincinnati ("City") is a political subdivision existing pursuant to the laws of the State of Ohio, and having the capacity and authority to sue and be sued in its own name. The City at all times relevant to this Complaint employed, controlled, or had the right to control police officers who committed the acts and conduct complained of herein while acting in the course and scope of their employment for the City.

5. Defendant Michael Roetting ("Roetting") was during all relevant times an officer with the Cincinnati Police Department acting under color of law. He is sued individually and in his official capacity as an employee of the City of Cincinnati.

6. Defendant Molly Shust ("Shust") was during all relevant times an officer with the Cincinnati Police Department acting under color of law. She is sued individually and in her official capacity as an employee of the City of Cincinnati.

7. Defendant Kurtis Latham ("Latham") was during all relevant times an officer with the Cincinnati Police Department acting under color of law. He is sued individually and in his official capacity as an employee of the City of Cincinnati.

IV. **COLOR OF LAW**

8. Kimutis is informed, believes, and alleges that, at all times relevant to this action, City, Roetting, Shust, and Latham acted in their official and governmental capacities and under color of state and local law, and all of the acts alleged herein were carried within the course and scope of their official duties and in its capacity as municipal corporation

V. **FACTS**

9. On Friday, May 29, 2020, people in Cincinnati began to assemble informal demonstrations after the killing of George Floyd in Minneapolis, Minnesota. Throughout that day and into the night, people gathered at government buildings, at parks and on the streets and sidewalk, chanting, singing, carrying signs and interacting among themselves with passers-by and media, even stopping traffic at times. Later that night, there were reports of property damage around the City and numerous arrests were made.

10. The next day, on May 30, 2020, Cincinnati's Mayor, John Cranley, released an emergency order ("Emergency Order").

11. The Emergency Order contained the Mayor's order for "implementation of a curfew from 10 p.m. to 6 a.m. in designated neighborhoods of the City of Cincinnati." ("Curfew") The Emergency Order further provided that:

> Individuals are prohibited from appearing in the public spaces of the City of Cincinnati neighborhoods of Over-the-Rhine, the Central Business District/Downton, the Banks, and the West End during the period of the curfew. This Order is inapplicable to the City of Cincinnati officials, members of the public safety forces, emergency personnel, health care professionals, essential workers, people experiencing homelessness and local government officials engaged in their lawful duties.

(*See* Exhibit 1)

Demonstrations resumed on Saturday, May 30, 2020 nonetheless. Despite the lawful and nonviolent nature of the overwhelming majority of those in attendance, Cincinnati police and

4

other law enforcement officers at various times deployed tear gas, pepper spray, pepper pellets, flashbang grenades, and other "non-lethal" projectiles, at times deploying the same against or in the vicinity of disabled persons, children, passersby, or others not involved in the demonstrations.[1]

12. On the evening of Saturday, May 30, 2020, Kimutis traveled from his home to Downtown Cincinnati.

13. Kimutis arrived Downtown at approximately 7:30 p.m. and parked at his car at the intersection of Central Avenue and Whetsel Alley. At that time, Kimutis observed a large crowd gathered outside the CPD District 1 Headquarters located on Ezzard Charles Drive. Kimutis spent approximately a half an hour in the area of District 1 observing the protests and police response. Then he left the scene in search of a place to eat dinner.

14. After trying several restaurants and wandering for approximately an hour, Kimutis found that nearly all of the restaurants in Downtown Cincinnati were closed, so he headed back to his car.

15. The time was approximately 9:00 p.m., and Kimutis was aware of the 10:00 p.m. curfew, so he intended to leave Downtown in compliance with the curfew.

16. However, as he walked back towards his car, Kimutis encountered a group of police officers who were firing tear gas at a group of demonstrators in the area south of Cincinnati Music Hall and east of Central Parkway.

17. The police were lined up on the eastern sidewalk of Central Parkway with a space of approximately 50 feet between the protestors and the police. As Kimutis observed, the police

---

[1] Amnesty International cited the enforcement of the Curfew in Cincinnati as one example of "egregious human rights violations" committed by law enforcement during the recent protests over the George Floyd killing. (https://www.amnesty.org/en/latest/news/2020/06/usa-end-unlawful-police-violence-against-black-lives-matter-protests/)

officers fired more tear gas into the crowd.

18. As he observed these events, Kimutis recognized a friend in the crowd of protestors and had a brief conversation with that person .

19. The two paused in their conversation and focused their attention on the police who appeared to be planning to advance on the crowd of demonstrators. In that moment, the sound of a shot being fired could be heard. Kimutis was then struck in the face with a large projectile. The object hit him in the eye with such force that he was knocked to the ground. The time was approximately 9:30 p.m.

20. Kimutis found himself lying flat on the ground unable to see with his face in searing pain and his ears ringing intensely.

21. As Kimutis felt his face, he sensed that it was covered in blood. Civilians in the crowd immediately attempted to assist Kimutis, helping him to his feet and leading him to an area next to a car where they sat him on the sidewalk. There, several people who had been present at the demonstration administered emergency first aid and helped him to assess his wounds. At the same time, the police officers who had formed a column on the eastern sidewalk of Central Parkway began to advance on the crowd of demonstrators, firing indiscriminately into the crowd.

22. The friend with whom Kimutis had been speaking located and retrieved the projectile that had hit Kimutis, which had landed on the ground nearby. A true and correct photograph of the projectile is attached hereto as **Exhibit 2**.

23. As Kimutis sat on the sidewalk, the people who had been helping him advised him that he was in need of critical medical attention. He was bleeding from his face and eye and had massive swelling and bruising. His face was covered with green powder which had exploded

6

out of the projectile and had gotten into his eye, ears, hair and skin, and had spread over and inside his open wounds.

24. The people who had come to Kimutis' aid scrambled to move him away from the chaos that had ensued as police advanced on the crowd and carried him across the street to Washington Park.

25. As they carried him, another friend who lived in the area recognized Kimutis and joined in the effort to assist him.

26. The civilians from the demonstrating crowd and Kimutis' friend took him to the nearby home of yet another friend who lived in the neighborhood. That person took Kimutis immediately to Christ Hospital to seek emergency care for his wounds.

27. In the chaos that the police had unleashed, Kimutis had become separated from the acquaintance to whom he spoke with earlier. However, that acquaintance contacted him soon thereafter to advise that he had recovered the projectile.

28. At the hospital, the medical professionals who treated him advised him that his eye socket had been crushed by the impact.

29. Kimutis' eye was swollen shut and covered in purple bruises. The emergency doctors opened the eye during the examination and asked him what he could see, and he could see nothing.

30. The emergency physicians at Christ Hospital determined that Kimutis' injuries were so severe that they required specialized treatment. Accordingly, the emergency department at Christ Hospital recommended that he be transferred to the University of Cincinnati Hospital.

31. Kimutis sat in the emergency department for hours awaiting transfer, completely blind in one eye, in horror and doubt as to whether he would ever see out of that eye again.

32. Later that night, Kimutis was transferred to University Hospital where he was treated for his injuries.

33. The doctors who treated him found the circumstances of his injury and the resulting damage to be sufficiently noteworthy that they authored a paper about his case which was ultimately published in the American Journal of Ophthalmology.

34. A true and correct copy of the case note published about Kimutis' injuries is attached hereto as **Exhibit 3**.

35. Kimutis was discharged early in the morning on the following day, with bandages covering his eye and still unable to see out of that eye. His clothes and hair remained stained with the green dye from inside the projectile. Over the following year, Kimutis underwent a lengthy battery of treatments in order to assist in the healing of his eye.

36. Kimutis suffered permanent damage to his eye as a result of the attack. Although Kimutis has recovered vision in that eye, it has never recovered fully to the state it was before the incident, and his doctors have opined that it will never fully recover.

37. The impact of the 40 millimeter round to Kimutis' eye left a macular hole in his retina. To this day, Kimutis has a blind spot, and experiences significant sensitivity to light. The injury has left him highly susceptible to cataracts.

38. Kimutis incurred significant medical costs and underwent dozens of treatments.

39. Kimutis sought recourse after the incident by filing complaints with the Cincinnati Citizen Complaint Authority ("CCA") and directly with the CPD. Neither agency was able to provide any documentation of the officer who fired the projectile that injured Kimutis.

40. The Internal Investigations Unit ("IIU") of the CPD seemingly denied that the incident had ever taken place.

41. In the filing of his complaints, Kimutis provided detailed descriptions of the time and place where the incident occurred and provided photographs illustrating the projectile and his injuries and detailed descriptions of the medical treatment he required. Nonetheless, in its written response to Kimutis' public records request, the CPD IIU stated: "The Internal Investigation Section was unable to substantiate this allegation". A true and correct copy of the IIU report is attached hereto as **Exhibit 4**.

42. This was the only written response that Kimutis received from the City of Cincinnati in response to his personal attempts to obtain information about the incident.

43. In telephone conversations, the Cincinnati police officer who conducted the investigation advised Kimutis explicitly that he was unable to identify the officer or officers who had fired the 40 mm round at Kimutis, and therefore was unable to pursue any meaningful investigation. Kimutis relied upon the representations of said officer.

44. Despite the exercise of reasonable diligence by Kimutis, he was unable to learn the identity of the Cincinnati police officers who shot him in the face with a 40 mm round.

45. Kimutis learned of the identity of Roetting, Shust, and/or Latham only on April 20, 2022, when retained counsel conducted a separate and independent investigation of the incident.

46. Similarly, the CCA advised Kimutis that since he was unable to identify the officer who had fired at him, they had no ability to undertake any proceedings to investigate the incident.

47. During the period in which the curfew was in effect, dozens or hundreds of CPD officers were armed with weapons that discharged "non-lethal" projectiles.

48. Publicly available footage shows CPD officers firing hundreds of pepper rounds and other types of projectiles at protestors and other persons present on the street without any direct supervision or instruction from any superior officer. CPD officers also made use of explosive grenades, tear gas, and tasers over the course of those days.

49. At no point was Kimutis issued an order to retreat, move or desist from any activity by any CPD officer. At no point was Kimutis charged with any crime. At no point was Kimutis observed to undertake any unlawful act. Kimutis was not in violation of the curfew at the time he was shot.

50. The use of 40mm foam rounds by CPD is the subject of a memorandum of agreement between the United States Department of Justice, the City, and the PD. Under the use of force policy provided in that memorandum, CPD agreed to "prohibit the use of [40mm foam rounds] against a crowd absent the ability to target a specific individual who poses an immediate threat to cause imminent physical harm; and absent the ability to reasonably assure that other individuals in the crowd who pose no threat of violence will not be struck by the weapons".

51. The memorandum further provides that "CPD will require all uses of force … to be reported in the same manner as the CPD currently reports incidents that classifies as uses of force … the use of force report will indicate each and every type of force that was used, and require the evaluation of each use of force".

52. The memorandum further provides that "CPD supervisors will investigate, evaluate and document each incident giving rise to a use of force … for compliance with CPD policy and to evaluate the tactics used by the officer".

53. The use of 40mm foam rounds is also governed under CPD Policy and Procedure 12.545, Use of Force.

54. Under that policy, "Any deployment of the beanbag shotgun, 40mm foam round, or Pepper Ball launcher during crowd control requires: • Specific targeting of a subject to be arrested or who represents an imminent risk of death or physical injury to the officer or others, except when using the Pepper Ball launcher as an area saturation tool. • The officer must be reasonably sure the weapons will not strike other individuals in the crowd who pose no threat of violence. If demonstrators or protesters are in a place, they have a legal right to be and are conducting themselves in a non-violent and lawful manner, an officer cannot make their conduct criminal by ordering them to disperse and arresting them if they refuse".

55. The provisions of the memorandum and the policy and procedures of CPD are in place for the protection and preservation of the safety and constitutional rights of the people of Cincinnati.

56. Nonetheless, during the curfew, upon information and belief, the City and CPD implemented rules of engagement and provided command directives that gave unbridled discretion to individual officers to make use of force indiscriminately against persons who were not committing crimes. The rules of engagement and policies of the City which created this climate violated the person and constitutional rights of Kimutis, among others.

## COUNT I - 42 U.S.C § 1983
### (*Excessive Force*)

57. Kimutis hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

58. Defendants City, Roetting, Shust, and/or Latham, under color of state law, deprived Mr. Hicks of rights, privileges and immunities secured by the Fourth and Fourteenth

Amendments to the U.S. Constitution, including but not limited to the right to be free from unreasonable seizure, excessive force, and violations of substantive due process. The actions of Defendants Roetting, Shust, and/or Latham reflect an unreasonable and arbitrary abuse of government power and infliction of excessive force, which shocks the conscience of the community.

59. The injuries suffered by Kimutis were proximately caused by the actions of Defendants City, Roetting, Shust, and/or Latham.

60. Defendant City of Cincinnati is vicariously liable for the actions of its Officers to the extent that the same were carried out in the course of their duties.

## COUNT II - 42 U.S.C § 1983
### (*Unreasonable seizure*)

61. Kimutis hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

62. Defendants Roetting, Shust, and/or Latham, under color of state law, deprived Mr. Hicks of rights, privileges and immunities secured by the Fourth and Fourteenth Amendments to the U.S. Constitution, including but not limited to the right to be free from unreasonable seizures of his person, and violations of substantive due process. The actions of Defendants Roetting, Shust, and/or Latham reflect an unreasonable and arbitrary abuse of government power and seizure in violation of Kimutis' constitutional rights, which shocks the conscience of the community.

63. On May 30, 2020, by shooting Kimutis in the face with a 40 mm marking round, Defendants City, Roetting, Shust, and/or Latham violated Kimutis' right to be free of unreasonable seizure of his person.

64. The act of shooting a citizen in the face with a 40mm foam marking round constitutes an "seizure" under the Fourth and Fourteenth Amendments of the United States Constitution. *See Torres v. Madrid*, 141 S.Ct. 989 (2021); *California v. Hodari D*, 499 U.S. 621 (1991).

65. Defendants City, Roetting, Shust, and/or Latham acted under color of law.

66. The injuries suffered by Kimutis were proximately caused by the actions of Defendants City, Roetting, Shust, and/or Latham.

67. Defendant City of Cincinnati is vicariously liable for the actions of its Officers to the extent that the same were carried out in the course of their duties.

## COUNT III
(*Failure to train, supervise, monitor, and/or discipline*)

68. Kimutis hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

69. The need for adequate training, supervision, monitoring, and discipline of officers in basic Constitutional principles and rights of citizens is obvious in light of the scope of duties assigned to City police officers. Inadequacy of training, supervision, monitoring, and discipline with respect to Constitutional rights is likely to result in violations of the rights of its citizens, such that the failure of the City to provide such training, supervision, monitoring, and discipline demonstrates the City's deliberate indifference to this need.

70. Subjects on which the needs for training, supervision, monitoring, and discipline are obvious include: the citizen's right to be free from unreasonable seizures of the person; the citizen's right to be free from excessive force employed by police officers.

71. Defendant City has a history of failing to adequately train, supervise, monitor, and discipline its officers, which has resulted in repeated violations of the Constitutional rights of citizens, including Kimutis.

72. To the extent that the City does have formal policies which purport to provide basic protection of the Constitutional rights of its citizens, the City has engaged in a practice of acquiescence to violations of those policies by failing to adequately discipline its officers for violations, failing to supervise, train and monitor to prevent such violations.

73. The City's failure to adequately train, supervise, monitor, and discipline officers for violations of constitutional rights is widespread, longstanding, and well-settled, such that it constitutes a custom and usage with the effective force of law.

74. The City's failure to adequately train and supervise its officers proximately caused the violation of Hicks right to be free from unlawful searches inside his home.

75. The City's failure to adequately train and supervise its officers proximately caused the violation of Hicks right to be free from excessive force.

76. Defendant City of Cincinnati is liable for the actions of its Officers to the extent that the same were carried out in the course of their duties.

## COUNT IV
### (*Monell v. Dept of Soc. Svcs. of New York,*
### *436 U.S. 658 (1978)*)

77. Kimutis hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

78. The Defendant City has implemented or executed policies or adopted widespread practices as custom with the force of law, all of which govern the conduct of its police officers.

79. Defendant City has adopted such policies, practices or customs in connection with each of the following police activities: use of force; crowd control.

80. The execution of City's policies and customs proximately caused the violation of Kimutis' right to be free from excessive force.

81. The execution of City's policies and customs proximately caused the violation of Kimutis' right to be free from unreasonable seizures of his person.

82. During all times relevant to this action, the City of Cincinnati enacted and pursued policies and procedures which related to the training, supervision, and retention of Defendant Officers. These policies and procedures were enacted and pursued with full knowledge that the Constitutional violations pleaded herein were a foreseeable result. The City of Cincinnati further ratified the actions of Defendant Officers. Defendant City of Cincinnati acted with deliberate indifference, with wanton and willful disregard, recklessly, and intentionally.

83. The policies and procedures of the City of Cincinnati were the proximate cause of the deprivation of Kimutis' constitutional rights.

84. The City's training and execution in and of the policies for use of force and crowd control is responsible for violation of the Constitutional rights of Kimutis, among others.

85. Defendant City of Cincinnati is liable for the actions of its Officers to the extent that the same were carried out in the course of their duties.

## COUNT V
### (*Battery*)

86. Kimutis hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

87. Defendants Roetting, Shust, and/or Latham intended to cause harm to Kimutis and, in fact, caused substantial physical harm resulting in his death.

88. Kimutis' injuries were proximately caused by the intentional, malicious, bad faith, wanton, and reckless actions of Defendants.

89. Defendant City of Cincinnati is liable for the actions of its Officers to the extent that the same were carried out in the course of their duties.

90. Kimutis did not know the identity of Roetting, Shust, and/or Latham at the time he was shot in the eye with a 40 mm round.

91. Kimutis was unable to discover the identity of Roetting, Shust, and/or Latham despite the exercise of reasonable diligence, until April 20, 2022.

## COUNT VI
### (REQUEST FOR WRIT OF MANDAMUS
*Under Ohio Open Records Act, R.C. § 149.43(C)(1)(b)*)

92. Kimutis hereby incorporates by reference the foregoing allegations as if the same were fully set forth herein.

93. Kimutis made a written request to the City of Cincinnati for public records of the incident recounted herein.

94. The sole response that Kimutis received to his public records request, was the correspondence described above, in which the CPD IIU stated: "The Internal Investigation Section was unable to substantiate this allegation". (*See* **Exhibit 4**).

95. However, CPD in fact generated, maintained, and made use of "Public Records" as that term is defined by R.C. § 149.43(A)(1).

96. Kimutis is aggrieved by CPD's failure to promptly prepare and make available to him the Public Records sought by him in his request.

97. Kimutis lacks a sufficient remedy at law and is entitled to a Writ ordering CPD to comply with R.C. § 149.43(B), statutory damages as authorized by R.C. § 149.43(C)(2), and an award of attorney's fees and court costs as authorized by R.C. § 149.43(C)(1)(b).

## PRAYER FOR RELIEF

Wherefore, Bryan Kimutis prays that the Court grant the following relief:

1. Compensatory damages in excess of $25,000.00 arising from Defendants actions and the denial of Plaintiff's rights, including without limitation the costs, expenses, and lost income or opportunities incurred in mounting his defense to the false charges brought against him, as well as for pain, suffering, and other losses;

2. Injunctive relief restraining the City of Cincinnati from subjecting its citizens to excessive force and/or unreasonable seizures of their person;

3. Punitive damages as may be authorized by law;

4. For an award of his reasonable attorney's fees and costs pursuant to the Civil Rights Attorneys Fees Award Act of 1976, 42 U.S.C. § 1988;

5. For an award of the taxable costs of court; and

6. For a Writ of Mandamus ordering Defendant City of Cincinnati to comply with R.C. § 149.43(B), statutory damages as authorized by R.C. § 149.43(C)(2), and an award of attorney's fees and court costs as authorized by R.C. § 149.43(C)(1)(b).

6. For such other and further relief as the Court may deem appropriate.

Respectfully submitted,

*/s/ J. Robert Linneman*
J. Robert Linneman (0073846)
H. Louis Sirkin (0024573)
Brian P. O'Connor (0086646)
SANTEN & HUGHES
600 Vine Street, Suite 2700
Cincinnati, OH 45202
(513) 721-4450
jrl@santenhughes.com
*Attorney for Plaintiff, Bryan Kimutis*

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

*/s/ J. Robert Linneman*
J. Robert Linneman

691544.1